**AFFIDAVIT**

I, Chad Oakes, having been first duly sworn, do hereby depose and state as follows:

*INTRODUCTION AND AGENT BACKGROUND*

1.      I have been a Special Agent of the Federal Bureau of Investigation ("FBI") since May 2005.  I am currently assigned to the Economic Crimes Squad in the FBI's Boston, Massachusetts Field Office.  My duties include investigating wire fraud, money laundering, and internet fraud schemes.  I have received extensive law enforcement training relating to a broad range of criminal matters, including financial crimes.  I also have extensive experience with the execution of search and seizure warrants.

2.      I am currently investigating B. Andrew Bushell ("Bushell") and Tracey M.A. Stockton ("Stockton") of Marblehead, Massachusetts (together, the "Targets") for various crimes, including wire fraud, in violation of Title 18, United States Code, Section 1343; bank fraud, in violation of Title 18, United States Code, Section 1344; conspiracy to commit wire fraud and bank fraud, in violation of Title 18, United States Code, Section 1349; false statements to a financial institution, in violation of Title 18, United States Code, Section 1014; theft of government funds, in violation of Title 18, United States Code, Section 641; conspiracy to commit unlawful monetary transactions, in violation of Title 18, United States Code, Section 1956(h); and unlawful monetary transactions, in violation of Title 18, United States Code, Section 1957 (together the "Subject Offenses").

3.      This affidavit is being submitted in support of a criminal complaint charging the Targets with conspiracy to commit wire fraud, in violation of Title 18, United States Code, Section 1349, and conspiracy to commit unlawful monetary transactions, in violation of Title 18, United

States Code, Section 1956(h)—both crimes in connection with their submission of fraudulent loan applications and subsequent transactions with the fraudulently obtained loan proceeds.

4.      I also submit this affidavit in support of applications for warrants, under Rule 41 of the Federal Rules of Criminal Procedure, to search the following premises, all in Marblehead, Massachusetts:

a.      The Targets' residence, located at 22 Endicott Avenue ("22 Endicott");

b.      The building located at 124 Pleasant Street ("124 Pleasant"); and

c.      The adjacent building located at 120 Pleasant Street ("120 Pleasant");

(together, the "Subject Premises"), as described more fully in Attachment A to each proposed warrant.  There is probable cause to believe, for the reasons stated below, that the Subject Premises contain evidence, fruits, and instrumentalities of the Subject Offenses, as described in Attachment B to each proposed warrant.

5.      The facts in this affidavit come from my personal observations and review of records, my training and experience, and information obtained from other agents and witnesses. This affidavit does not set forth all facts developed during the course of this investigation and does not set forth all of my knowledge about this matter.  It is intended to show that there is probable cause to believe that the Targets have committed the above-described offenses and that there is probable cause for the requested search warrants.

## *PROBABLE CAUSE*

## **Relevant Individuals and Entities**

6.　　Bushell was a resident of Marblehead, Massachusetts.　According to online profiles,[1] filings in a 2019 civil lawsuit,[2] and other records, Bushell claimed that he was an Orthodox Christian monk and that he had trained at a monastery on Mount Athos in Greece.　He presented himself as "Father" and "Rev. Fr." Bushell or Andrew.　Bushell claimed to have been elected to the titles of "Protos" (*i.e.*, monastic officer) and President of St. Paul's Foundation ("St. Paul's") and to serve as the "Guardian" of the Shrine of St. Nicholas the Wonderworker, Patron of Sailors, Brewers & Repentant Thieves ("St. Nicholas") and the "Superior" of Annunciation House. Investigators have not confirmed whether Bushell in fact is an Orthodox monk or trained at Mount Athos.[3]

---

[1] *See*, *e.g.*, Robert Lane Fox, *In Search of the Most Heavenly Roses for a Church Garden*, FINANCIAL TIMES (July 1, 2022), https://www.ft.com/content/15a9f79f-76d9-4990-92c2-a5836ad15e61 ("He joined a monastery on Athos, and learnt how to separate sea salt from seawater. … After eight years, the heads of the Orthodox order dispatched him from Athos to be the 'protos', the number one, of the St Paul's Foundation, a loose grouping in the US that tries, like the apostle, to spread the Christian religion.　Fr Andrew came up with donors and a plan for a church in honour of St Nicholas, to be built in Marblehead, Massachusetts.").

[2] In 2019, St. Paul's and St. Nicholas sued Marblehead's Building Commissioner regarding the latter's suspension of a building permit for 124 Pleasant.　*St. Paul's Foundation v. Baldacci, et al.*, 1:19-cv-11504-DJC (D. Mass.) (the "Marblehead litigation").

[3] During a deposition taken in the Marblehead litigation in July 2020, Bushell stated under oath that he became a monk when he traveled to Mount Athos in December 2010 and that an Abbot at Vatopedi Monastery declared that Bushell was to be a monk.　Asked how long he was at Mount Athos, Bushell stated, "I was a member of the Athos community until August of 2017."　However, asked how much time he would spend there, Bushell responded that he had "no idea"; that he had traveled often for the work of the church; and that he performed jobs at Mount Athos unless he was told to perform work outside of Mount Athos.

I have reviewed encounter records from U.S. Customs and Border Protection ("CBP") for Bushell.　CBP records reflect frequent travel to Europe beginning around 2010, including in December 2010; however, CBP records indicate that Bushell returned to the United States in

7.      Stockton was a resident of Marblehead, Massachusetts.  According to public records, Stockton was a registered attorney in Massachusetts since 2013 and was the general counsel for St. Paul's.  Based on their shared residential address (22 Endicott) and the investigation to date, including surveillance of that residence, I understand that Stockton and Bushell live together.

8.      The Targets purported to operate several non-profit religious and business organizations.  For each of these affiliated entities, Bushell was the principal officer, and Stockton was the registered agent and/or an individual authorized to execute documents for the entity.

a.      Bushell registered St Paul's with the Delaware Department of State on or about May 26, 2011.  According to its website, St. Paul's was a monastic institute of the Orthodox Church.[4]

b.      Bushell registered St. Nicholas as a religious corporation with the Massachusetts Secretary of the Commonwealth on or about June 22, 2017.  According to its website, St. Nicholas was a monastic house that hosted religious services and community events.[5]  St. Nicholas was located at 124 Pleasant.

c.      Bushell registered Annunciation House as a religious corporation with the Massachusetts Secretary of the Commonwealth on or about May 22, 2017.  According to public

_____

January 2011 and spent little extended time outside of the United States following that trip.

[4] In a declaration filed in the Marblehead litigation, Bushell stated: "In 2011, in consultation with other monks on Mount Athos, I established St. Paul's in the United States.  A few years later, again in cooperation and consultation with my fellow monastics on Mount Athos, we formed a plan for St. Paul's to establish an Orthodox Christian monastic complex in the United States."

[5] During the July 2020 deposition, Bushell stated that neither St. Paul's nor St. Nicholas had any affiliation with the Boston Orthodox Church.  Bushell stated that he had autonomy over all decisions for St. Nicholas and that neither St. Nicholas nor St. Paul's had a board of directors.

4

filings, Annunciation House was located at 22 Endicott and purported to serve as a residence for Bushell and other clergy.  However, based on the investigation to date, including surveillance, I understand that only Bushell, Stockton, and, at times, Stockton's mother resided at 22 Endicott.

     d.     Bushell registered Marblehead Salt Co. LLC ("Marblehead Salt") with the Massachusetts Secretary of the Commonwealth on or about May 17, 2013.  According to its website, Marblehead Salt produced and sold kosher, artisanal craft salt and donated profits to local charities, including St. Paul's.  The website listed Marblehead Salt's address as 124 Pleasant and referred to Bushell as "the Salter of Marblehead."

     e.     Bushell registered Marblehead Brewing Co. LLC ("Marblehead Brewing") with the Massachusetts Secretary of the Commonwealth on or about April 16, 2014.  According to its website, Marblehead Brewing was an Orthodox monastic brewery located inside St. Nicholas, at 124 Pleasant, and profits from the sale of Marblehead Brewing's beer supported the charitable works of St. Paul's.

     9.     The U.S. Small Business Administration ("SBA") was an agency of the United States government authorized to enable and provide for loans, guaranteed by the government, both directly and through banks, credit unions, and other lenders.

     10.     Marblehead Bank was based in Massachusetts and insured by the Federal Deposit Insurance Corporation ("FDIC").  It was an approved lender of PPP loans, which are described below.

     11.     Greylock Federal Credit Union ("Greylock") was based in Massachusetts and insured by the National Credit Union Administration ("NCUA").  It was an approved lender of PPP loans.

## Overview of Federal COVID-19 Relief Programs

12.     The Coronavirus Aid, Relief, and Economic Security ("CARES") Act is a federal law enacted in March 2020 and designed to provide emergency financial assistance to Americans suffering the economic effects of the COVID-19 pandemic.

13.     The CARES Act authorized the SBA to provide Economic Injury Disaster Loans ("EIDL") of up to $2 million to small businesses and other eligible entities, including non-profit organizations, that were affected by the COVID-19 pandemic.  The EIDL program required entities receiving funds to use the funds only on certain permissible expenses, such as payments of fixed business debts, payroll accounts payable, and other business-related expenses that the entity could have paid had the pandemic not occurred.  Neither the CARES Act nor the EIDL program authorized borrowers to use funds to establish a new business or non-profit organization or to make capital improvements.

14.     Applicants applied for EIDL funds through the SBA's online portal and application. The EIDL loan application process required applicants to provide information concerning the affected entity, including ownership, number of employees, and gross revenues and costs of goods sold in the 12 months prior to January 31, 2020.  For non-profit organizations, the SBA determined loan eligibility based on an organization's operating costs rather than its revenue.  Applicants electronically certified that the information provided was accurate, and the SBA's portal and application warned applicants that any false statement or misrepresentation to the SBA or any misapplication of loan proceeds could result in sanctions, including criminal penalties.

15.     The SBA relied upon the information provided by the applicant to calculate how much money the non-profit or small business was eligible to receive in the form of an EIDL loan. Additionally, the SBA relied on the accuracy and truthfulness of supporting documents provided

by the applicant, including any statements identifying operating expenses, revenues, gross profits, and net income, in making its determination to issue an initial EIDL loan or to increase the loan amount at the request of the borrower.

16.     Another source of relief provided by the CARES Act was the authorization of forgivable loans to small businesses and non-profits for job retention and certain other expenses through the Paycheck Protection Program ("PPP").

17.     In order to obtain a PPP loan, a qualifying business or non-profit had to submit a PPP loan application signed by an authorized representative of the business.  The PPP loan application required the business or non-profit, through its authorized representative, to acknowledge the program rules and make certain affirmative certifications.  In the PPP loan application, the small business or non-profit, through its authorized representative, had to state, among other things, its (i) number of employees and (ii) average monthly payroll expenses.  These figures were used to calculate the amount of a PPP loan the business or non-profit was eligible to receive.  In addition, businesses or non-profits applying for a PPP loan generally were required to provide documentation of their payroll expenses.

18.     A PPP loan application had to be processed by an authorized SBA lender.  If a PPP loan application was approved, the participating lender funded the PPP loan using its own monies, which were 100 percent guaranteed by the SBA.  Data from the application was regularly transmitted by the lender to the SBA in the course of processing the loan.

19.     PPP loan proceeds had to be used by the business or non-profit on certain permissible expenses, including payroll costs, interest on mortgages, rent, and utilities.  The PPP allowed the interest and principal on the PPP loan to be entirely forgiven if the business or non-profit spent the loan proceeds on these permissible expenses within a designated period of time,

used a certain percentage of the PPP loan proceeds on payroll expenses, and submitted documentation of those payroll expenses.

## Overview of the Conspiracy

20.     Beginning shortly after CARES Act funds became available in April 2020 and continuing until August 2022, the Targets conspired to obtain EIDL and PPP funds by submitting fraudulent applications and to use those funds for personal and/or non-permitted purposes.

21.     Between April 2020 and January 2022, the Targets submitted loan applications, supporting documentation, and, with respect to EIDLs, loan increase requests to the SBA and to PPP lenders on behalf of their affiliated entities, described above.  On these applications, the Targets consistently misrepresented the organizations' revenues and operational and payroll expenses with the sole purpose of obtaining higher loan amounts.  The Targets also falsified financial statements and other supporting documents in order to secure these loans.

22.     After receiving EIDL and PPP funds, the Targets transferred funds between their various entities and bank accounts and issued checks to create the appearance of payroll expenses that would qualify for PPP loan forgiveness.  Rather than spending the EIDL and PPP funds on permitted operating or payroll expenses, the Targets spent millions of dollars on extensive capital improvements to 120 Pleasant and 124 Pleasant and on the purchase of a residential property.  The Targets also used EIDL and PPP funds on personal expenses, including travel and luxury goods. While the Targets claimed that their affiliated organizations received support from donors and generated their own revenues to fund philanthropic works, the Targets used fraudulently obtained pandemic relief money to finance their building projects and lifestyles.

**EIDL Applications**

23.     As set forth below, Bushell submitted EIDL applications and, in some cases, loan increase requests, on behalf of six entities.[6]   In total, these applications and requests sought $5,005,300 in EIDL funds.

24.     On each application he submitted, Bushell listed himself as the primary contact, guarantor, and signer.   The applications for St. Paul's and St. Nicholas listed Stockton as the application preparer.

25.     For each entity's application, Bushell designated a bank account to receive EIDL funds.   Bushell and/or Stockton were signatories on each of the designated accounts.

26.     On each EIDL application, Bushell claimed total revenues and operating costs for 2019 that greatly exceeded each individual borrowing entity's actual revenues and expenses and, in some cases, the revenues and expenses of all of Bushell's organizations combined.[7]   Bushell also listed differing amounts of revenues and operating costs on different applications and loan increase requests for the same organization.

27.     For each of the EIDL applications and loan increase requests that the SBA approved, Bushell finalized the loan or loan modification by electronically signing an SBA Loan

---

[6] The SBA received EIDL applications through cloud-based platforms.   Based on the submission dates and the application numbers, each of the EIDL applications that Bushell submitted were received through an SBA server located in West Des Moines, Iowa.

[7] The total expenses across all organizational bank accounts controlled by the Targets in 2019 was approximately $313,000, lower than the total operating costs that the Targets reported on applications and increase requests for each of St. Paul's and St. Nicholas.  Moreover, those total expenses include cash withdrawals and items that appear to be personal expenses, such as travel and dining, pet care, personal medical care, grocery store purchases, subscription services, and the condominium fee for a property Bushell maintained in Washington, D.C.

Agreement, in which he certified that the representations made in the application or request were true and correct.

28.     As a result of the misrepresentations on these EIDL applications, the SBA approved four applications, as well as four loan increases, and disbursed a total of $3.5 million in EIDL funds via wire transfer to bank accounts controlled by the Targets.[8]

*St. Paul's EIDL Application*

29.     On or about April 1, 2020, Bushell submitted an electronic EIDL application for St. Paul's, on which he indicated that Stockton had prepared the application.  This application stated that St. Paul's had a total of $450,000 in operational costs for the 12-month period preceding January 31, 2020.

30.     On or about June 4, 2020, the SBA approved an EIDL for St. Paul's in the amount of $150,000—the maximum available amount under the EIDL program—based on the $450,000 in operational costs claimed on the application.

31.     On or about April 6, 2021, the SBA increased the maximum EIDL loan amount from $150,000 to $500,000.

32.     Subsequently, on or about April 24, 2021, Bushell used the SBA's online portal to request an increase to St. Paul's EIDL.  Bushell provided the SBA with a profit and loss statement for St. Paul's that listed $746,924 in operational expenses for 2019, itemized as follows:

| | |
|---|---|
| Program Services | $707,764 |
| Travel and Meal Expense | $26,101 |
| Office Expense and Supplies | $13,059 |

---

[8] All EIDL loan and advance disbursements are initiated by the SBA Denver Finance Center, located in Denver, Colorado, which transmits the payment information through the Financial Management System ("FMS") to the Treasury.  The primary server for FMS is located in Sterling, Virginia.

33.     SBA records indicate that this higher amount of yearly operational expenses qualified St. Paul's for the maximum EIDL amount allowed by the SBA at the time, $500,000. Accordingly, the SBA approved an increase in St. Paul's EIDL from $150,000 to $500,000 on or about July 6, 2021 and disbursed an additional $350,000 to St. Paul's on or about July 9, 2021.

34.     On or about September 8, 2021, the SBA again increased the maximum available EIDL loan amount, from $500,000 to $2 million.

35.     Subsequently, on or about September 11, 2021, Bushell requested another increase to the EIDL for St. Paul's.  Bushell submitted an updated profit and loss statement for St. Paul's, which now listed $1,199,728 in operational expenses for 2019.[9]   The updated profit and loss statement added the following itemized expense:

Shrine of St. Nicholas Building and Maintenance Funding Obligation        $452,805

36.     Bushell also submitted to the SBA the SBA's form "Resolution and Certification," which authorized Bushell to submit loan applications and related documents to the SBA on behalf of St. Paul's.  Stockton certified this resolution by signing it.  In his September 29, 2021 email transmitting the resolution to the SBA, Bushell copied Stockton and invited SBA personnel to direct questions to Stockton.

37.     According to SBA records, the updated amount of operational expenses that Bushell claimed on this second loan increase request qualified St. Paul's for the new maximum

---

[9] SBA records indicate that the Targets engaged an accountant to assist with the profit and loss statement submitted with this second loan increase request and certain other applications and requests discussed in this affidavit.  Based on records that I have reviewed, including financial statement compilations prepared by the accountant, I believe that the accountant prepared financial statements for the Targets' affiliated entities based solely on information that the Targets provided to the accountant.  For example, compilation statements submitted to Greylock in 2022 state: "Management is responsible for the accompanying financial statements of St. Paul's Foundation, … I did not audit or review the financial statements nor was I required to perform any procedures to verify the accuracy or completeness of the information provided by management."

EIDL amount allowed by the SBA, $2 million.  Accordingly, the SBA approved an increase in St. Paul's EIDL from $500,000 to $2 million and disbursed an additional $1.5 million to St. Paul's on or about November 16, 2021.

38.     I have reviewed records for all three bank accounts for St. Paul's that were active in 2019.  These records indicate that St. Paul's had, at most, approximately $248,000 in paid expenditures for the year, in contrast to the approximately $747,000 that Bushell claimed.

39.     The records do not support the itemized expenses that Bushell reported or other representations on the application and requests.  For example, on the application, Bushell provided the following description of St. Paul's secular social services: "We provide food, medicine, educational assistance and job and career counseling."  However, I did not observe any expenses corresponding to these categories in St. Paul's financial records.

40.     With respect to the St. Nicholas building obligation, the accountant explained in an email to the SBA that those costs, coupled with a corresponding obligation owed by St. Nicholas, represented approximately $900,000 in costs accrued (but not yet paid) in 2019.  However, filings from the Marblehead litigation indicate that no work was performed at 124 Pleasant between January 2019, when the town suspended St. Nicholas's building permit, and September 2019, when the permit was reinstated.[10]  Based on my review of actual payments to the general contractor, beginning in March 2021, and my observation of the work performed at 124 Pleasant Street during this investigation, I believe that Bushell caused the accountant to back-date the accrual of renovation expenses for 124 Pleasant in order to claim them as 2019 expenses.

---

[10] In Bushell's declaration, he explained that, at the time the town suspended the building permit in January 2019, "St. Nicholas had started exploratory demolition and installed two layers of fireproof gypsum board on the ceiling of the church hall[.]"

41.     Based on the foregoing, I believe that the Targets inflated the operational expenses that they reported on the St. Paul's EIDL application and the subsequent two loan increase requests for the purpose of obtaining the maximum EIDL amount authorized by the SBA at the time of each submission.

42.     As a result of the misrepresentations to the SBA, the SBA ultimately disbursed a total of $2,000,000 in EIDL funds to St. Paul's.

*St. Nicholas EIDL Application*

43.     On or about April 6, 2020, Bushell submitted an EIDL application for St. Nicholas, on which he indicated that Stockton had prepared the application.  This application stated that St. Nicholas had a total of $350,000 in operational costs for the 12-month period preceding January 31, 2020.

44.     On or about June 5, 2020**,** the SBA approved a $150,000 EIDL for St. Nicholas, based on the $350,000 in operational costs claimed on the application.

45.     On or about April 24, 2021, after the SBA increased the maximum EIDL amount to $500,000, Bushell requested a loan increase for St. Nicholas.  SBA records reflect that Bushell provided a profit and loss statement for St. Nicholas that claimed $415,946 in 2019 operational expenses, with itemized expenses for program services, depreciation, interest, office and supplies, and insurance.  According to SBA records, Bushell explained to the SBA that he had made an error on the initial application and that this statement reflected finalized, correct amounts.

46.     According to SBA records, this higher amount of expenses qualified St. Nicholas for the maximum EIDL amount allowed by the SBA at the time, $500,000.  Accordingly, the SBA approved an increase in St. Nicholas's EIDL from $150,000 to $500,000 and disbursed an additional $350,000 to St. Nicholas on or about July 9, 2021.

47.     On or about September 11, 2021, after the SBA announced the increase in the EIDL cap from $500,000 to $2 million, Bushell requested another increase to the EIDL for St. Nicholas. As he did with respect to St. Paul's, Bushell submitted an updated profit and loss statement for St. Nicholas, which claimed operational expenses for 2019 of $856,747.  Like the updated statement for St. Paul's, the updated profit and loss statement for St. Nicholas's added a building and maintenance funding obligation in the amount of $440,802, which the accountant explained were expenses that St. Nicholas accrued in 2019.

48.     As he did with respect to St. Paul's, Bushell submitted a "Resolution and Certification" with respect to St. Nicholas, which Stockton certified.

49.     According to SBA records, the updated operational expenses would have qualified St. Nicholas for an increase in its loan amount from $500,000 to $1,122,300.  However, because of inconsistencies in Bushell's submissions, the SBA declined the request for St. Nicholas on or about October 30, 2021.

50.     I have reviewed records for the two bank accounts for St. Nicholas that were active in 2019.  These records indicate that St. Nicholas had, at most, $37,383 in paid expenditures from its accounts for the year—only for utilities and repayment of a loan—in contrast to the actual expenses that Bushell reported to the SBA.  Further, from documents in the Marblehead litigation and interviews with Town of Marblehead, I am aware that St. Nicholas's physical location, 124 Pleasant, was closed for most or all of 2019.[11]

---

[11] In an August 2020 deposition, Bushell stated under oath that St. Nicholas had not been able to offer any services in 2019.  He stated, "there were hundreds of services, two services a day for an entire year that we were not able to celebrate because of [the Building Commissioner,] that we're still not able to celebrate[.]"

51.     Based on the foregoing, I believe that the Targets inflated the operational expenses that they reported on the St. Nicholas EIDL application and the subsequent two loan increase requests for the purpose of obtaining increased EIDL amounts authorized by the SBA at the time of each submission.

52.     As a result of the misrepresentations to the SBA, the SBA ultimately disbursed a total of $500,000 in EIDL funds to St. Nicholas.

*Annunciation House EIDL Application*

53.     On or about August 11, 2020, Bushell submitted an EIDL application for Annunciation House.  This application indicated that Annunciation House had a total of $250,000 in operational costs for the 12-month period preceding January 31, 2020.

54.     SBA records indicate that, in correspondence with the SBA in August 2020, Bushell requested the maximum EIDL amount authorized by the SBA at the time, $150,000.  After initially receiving a notice that the application was declined, Bushell wrote to the SBA on December 31, 2020: "Annunciation House is a church. … We are still interested in an EIDL loan as we, like all churches, are suffering from Government mandated closures and restrictions.  We respectfully request that our request for an EIDL in the amount of $125,000 be approved or you state in writing the reasons why with specificity."

55.     In March 2021, the SBA requested additional information from Bushell, including a profit and loss statement.  On or about March 29, 2021, Stockton submitted information to the SBA about Annunciation House's non-profit status.  On or about April 2, 2021, Bushell provided the SBA with a document titled "Statement of Profit and Loss – Actual for the Year Ended December 31, 2019."  This profit and loss statement itemized expenses of $420,404 as follows:

| | |
|---|---|
| Program Services | $336,806 |
| Travel and Meals | $50,176 |

| | |
|---|---|
| Professional Development | $10,202 |
| Utilities | $8,342 |
| Administrative Expenses | $5,139 |
| Professional Fees | $5,026 |
| Rent and Maintenance Expense | $1,749 |
| Insurance Expenses | $1,623 |
| Office Expenses and Supplies | $1,341 |

56.     On or about April 9, 2021, the SBA approved a $150,000 EIDL for Annunciation House, based on the $420,404 in organizational costs indicated on the profit and loss statement.

57.     On or about May 24, 2021, after the SBA increased the maximum EIDL amount to $500,000, Bushell contacted the SBA and requested an increase to Annunciation House's EIDL. According to SBA records, on or about July 2, 2021, the SBA determined that the yearly operational expenses described in the 2019 profit and loss statement that Bushell previously provided ($420,404) qualified Annunciation House for the new maximum EIDL amount. Accordingly, the SBA approved an increase to Annunciation House's EIDL from $150,000 to $500,000 on or about July 9, 2021 and disbursed an additional $350,000 to Annunciation House on or about July 12, 2021.

58.     On or about September 11, 2021, after the SBA increased the maximum EIDL amount to $2 million, Bushell submitted a second request for an increase in the EIDL for Annunciation House, from $500,000 to $840,900.  SBA records indicate that the SBA initially approved this request but ultimately declined it on or about January 25, 2021, because of inadequate supporting documentation.

59.     I have reviewed records for Annunciation House's bank accounts.  All of these accounts were opened in or after April 2020.  I am aware of no records of other bank accounts controlled by the Targets that support any of the itemized expenses for 2019 that Bushell reported for Annunciation House.

16

60.     Based on my review of the applications and the bank records, I believe that Bushell triple-reported non-existent "program services" and other expenses on the applications for St. Paul's, St. Nicholas, and Annunciation House.  Further, based on the investigation to date, I am aware that Annunciation House is the Targets' residence (22 Endicott).

61.     Based on the foregoing, I believe that Bushell misrepresented Annunciation House as a church and fabricated operational expenses on the EIDL application and loan increase requests for the purpose of obtaining additional EIDL funds through this separate legal entity.

62.     As a result of these misrepresentations, the SBA ultimately disbursed a total of $500,000 in EIDL funds to Annunciation House.

*Holy Metropolis EIDL Application*

63.     On or about August 14, 2020, Bushell submitted an EIDL application for Holy Metropolis of Rhodopolis and Exarchate of Lazica ("Holy Metropolis"), a church corporation that they registered with the Massachusetts Secretary of the Commonwealth on or about July 31, 2020.[12]  The application listed Bushell and "T.A."—initials for Father 1—as the owners of Holy Metropolis and Bushell as the authorized representative.   This application indicated that Metropolis had a total of $500,000 in operational costs for the 12-month period preceding January 31, 2020.

---

[12] Holy Metropolis's organization documents listed Stockton as Holy Metropolis's registered agent and Father 1, a Greek Orthodox priest, as its sole officer and director.  Father 1 told investigators that Bushell offered to help Father 1 create a corporation in Massachusetts for the purpose of obtaining PPP and EIDL funds, which Father 1 understood would supplement his income.  According to Father 1, Bushell established bank accounts for the corporation and funded them with money from Father 1, but Bushell maintained sole authority over the accounts and did not grant Father 1 access to the accounts.  Father 1 stated that he believed that Bushell used the accounts for his own gain.

64.     EIDL program rules required that an organization must have been in business as of January 31, 2020, to be eligible for an EIDL.  On the application, Bushell indicated that Holy Metropolis began operations on November 29, 2019.  However, SBA records indicate that, during its review of the application for Holy Metropolis, the SBA determined that Holy Metropolis had been formed on or about July 31, 2020.  Accordingly, on or about August 19, 2020, the SBA declined the application.

65.     I have reviewed records for Holy Metropolis's bank accounts.  All of these accounts were opened in or after August 2020.

66.     Based on the foregoing, I believe that Bushell formed Holy Metropolis and fabricated operational costs to attempt to obtain additional EIDL funds with this separate entity.

*Marblehead Salt EIDL Application*

67.     On or about May 30, 2021, Bushell submitted an EIDL application for Marblehead Salt.  The application indicated that the company had a total of $175,000 in operational costs for the 12-month period preceding January 31, 2020.

68.     On or about June 14, 2021, Bushell provided the SBA with a document titled "Marblehead Salt Company, LLC Income Statement Year-Ended December 31, 2019."  This document listed total 2019 expenses of $80,103, itemized as follows:

| | |
|---|---|
| Payroll | $24,291 |
| Utilities | $55,423 |
| Licenses and Dues | $389 |

69.     On or about the same day, the accountant and Stockton emailed SBA personnel to explain why Marblehead Salt was not required to file tax returns.

70.     On or about June 23, 2021, after the SBA had preliminarily approved Marblehead Salt for an EIDL of $352,600, Bushell emailed SBA personnel to ask why the SBA had not

approved Marblehead Salt for the maximum loan amount based on the 2019 revenue ($442,090) and gross profit ($345,934) that Bushell had reported on the income statement.  Bushell stated: "We believe that we are entitled to the full benefit of the program which is $500,000."

71.     On or about June 26, 2021, the SBA approved a $500,000 EIDL for Marblehead Salt.

72.     I have reviewed records for the only bank account for Marblehead Salt that was active in 2019.  These records reflect only one transfer, a foreign wire for approximately $3,000, from that bank account in 2019.  No records for any other bank accounts controlled by the Targets reflect the payroll or utilities expenses, revenues, or profits that Bushell claimed for Marblehead Salt.

73.     Based on the foregoing, I believe that Bushell inflated the expenses, revenues, and profits that he reported on the EIDL application and supporting documentation for Marblehead Salt.

*Marblehead Brewing EIDL Application*

74.     On or about October 18, 2021, Bushell submitted an EIDL application for Marblehead Brewing.  The application indicated that Marblehead Brewing had a total of $193,202 in operational costs for the 12-month period preceding January 31, 2020.

75.     Bushell submitted a "Resolution and Certification" for Marblehead Brewing, which Stockton certified.

76.     In support of the Marblehead Brewing application, on or about January 6, 2022, Bushell provided a profit and loss statement, which itemized total 2019 expenses as follows:

| | |
|---|---|
| Payroll | $183,029 |
| Equipment Leases | $4,482 |
| Other Operating Expenses | $1,965 |
| Interest Paid | $1,200 |

| | |
|---|---|
| Office Supplies | $232 |
| Equipment Repair | $176 |

77.     SBA records indicate that, because the SBA suspected fraud in the Marblehead Brewing application, the SBA declined the application on or about October 29, 2021, and again on or about February 23, 2022 after reconsideration.

78.     I have reviewed records for the only bank account for Marblehead Brewing that was active in 2019.  These records reflect a total of $18,569 in expenditures from that account for the year.  Records for St. Paul's bank accounts show approximately $16,000 in additional brewing expenses.  The bank account records show no additional expenses for Marblehead Brewing.

79.     Based on the foregoing, I believe that Bushell substantially inflated the operational costs that he reported for Marblehead Brewing in an attempt to obtain a larger EIDL.

### The PPP Applications

80.     During the same period, Bushell signed and submitted at least nine applications for PPP funds to two financial institutions—Marblehead Bank and Greylock—on behalf of six of their affiliated entities.  Stockton submitted supporting documentation in connection with several of these applications.  In total, these applications sought approximately $945,803 in PPP funds.[13]

81.     On these applications and supporting documents, the Targets fabricated average monthly payroll expenses of their affiliated entities and claimed employees that the borrowing entities did not actually employ.  In many cases, the applications and supporting documentation

---

[13] The PPP applications were ultimately transmitted to the SBA through a cloud-based platform via servers located in Oregon.  The SBA's platform performed an initial screening of loan applications and underwriting of loans, via servers in Sterling, Virginia, and then transmitted the loan decision and information back to the PPP lender.  Once the lender received the SBA loan number, the lender processed the closing loan documents and disbursed the PPP funds to the borrower.

that the Targets submitted contradicted each other, as well as applications for EIDL funds that Bushell submitted for the same entities.

82.     Cumulatively, had the payroll expenses that these applications claimed been accurate, the six organizations would have paid payroll expenses of at least $3,736,132 combined, and Bushell and Stockton each would have earned annual salaries of at least $500,000.

83.     Contrary to their claimed annual payroll of $3.7 million dollars, a review of bank records for these six entities identified no payroll expenses paid in 2019.  The Targets began issuing paychecks on or about June 8, 2020, when Stockton signed five checks for Bushell for $8,333 each, and Bushell signed three checks for Stockton for $6,020 each, all from St. Paul's.  These checks purported to be for pay periods between January and May 2020.  Stockton subsequently signed another 33 paychecks for Bushell from St. Paul's, St. Nicholas, and Annunciation House, for a total of $341,666 through June 2021, and Bushell signed another four paychecks from St. Paul's for Stockton, for a total of $34,824 through August 2020.  Each of the checks issued to Bushell was deposited into a Marblehead Bank account for St. Paul's, while each check for Stockton was deposited into a personal bank account for Stockton.[14]  Based on the investigation to date and my training and experience, I believe the Targets wrote these payroll checks for the sole purpose of documenting sham payroll expenses in support of PPP loan forgiveness applications.  The Targets issued no paychecks to other individuals during this period.

84.     As a result of misrepresentations on PPP applications, the Targets' organizations received a total of approximately $146,608 in PPP funds.

---

[14] When applying for PPP loans, Bushell and Stockton claimed in correspondence that Bushell was a member of a religious order that required its members to take a vow of poverty, renounce all claims to earnings, and turn earnings over to the order.  The investigation to date has identified no members of this order other than Bushell.

85.     These misrepresentations included the following false statements on applications:

a.     In an April 2020 application to Marblehead Bank, Bushell reported that St. Paul's had two employees and an average monthly payroll cost of $16,666 ($8,333 per employee, or $100,000 annualized—the PPP's cap for includable payroll costs).   In correspondence with the bank, Bushell explained that St. Paul's did not have a payroll for 2019 but started paying two full-time employees (Bushell and Stockton) in January 2020.[15]   Marblehead Bank approved a PPP loan of $41,665 for St. Paul's.   The Targets submitted a loan forgiveness application for this PPP loan, signed by Bushell, in December 2020.   In a cover letter, Stockton itemized St. Paul's purported disbursement of PPP funds for payroll, mortgage, and utilities, "in full compliance with the requirements of the program."   The SBA forgave this PPP loan on or about January 19, 2021.[16]

b.     In a January 2021 "second draw" PPP application to Marblehead Bank, Bushell again reported that St. Paul's had two employees (Bushell and Stockton) whom it paid $16,666 each month.   In connection with this application, Stockton sent Marblehead Bank four Internal Revenue Service Forms 941 ("Employer's Quarterly Federal Tax Return"), signed by Stockton, which purported to show salary for Stockton in each quarter of 2020.   Marblehead Bank approved a second draw PPP loan of approximately $41,667.   This PPP loan was also forgiven, on or about February 14, 2022.

---

[15] The PPP application permitted new businesses to calculate average monthly payroll using the time period from January 1, 2020 through February 29, 2020, excluding costs over $100,000 on an annualized basis for each employee.

[16] The PPP forgiveness application required borrowers to certify that they complied with all the requirements of the PPP rules and provided true and correct information.   With their PPP forgiveness applications, the Targets variously submitted certain supporting documents, including statements by Stockton about the use of PPP funds on payroll, mortgage, and utilities; quarterly employer tax documents; and copies of checks described above.

c.      In a January 2021 PPP application to Marblehead Bank, Bushell reported that St. Nicholas had one employee (Bushell) and an average monthly payroll cost of $8,333.  Stockton submitted a letter on or about February 1, 2021, to which she attached copies of "checks made payable to St. Paul's Foundation evidencing payment of Fr. Andrew's wages into his Order[.]" Marblehead Bank approved a PPP loan of approximately $20,833 in February 2021.  In April 2021, the Targets submitted a loan forgiveness application signed by Bushell, with a cover letter signed by Stockton.  The SBA forgave the loan on or about August 10, 2021.

d.      In February 2021, Bushell submitted a second draw application to Marblehead Bank, in which he reported that St. Nicholas had one employee (Bushell) and paid average monthly payroll expenses of $8,644.  Marblehead Bank approved a second draw loan of approximately $21,610 for St. Nicholas, which the SBA forgave on or about February 14, 2022.

e.      In April 2021, Bushell submitted four second draw applications to Marblehead Bank for St. Nicholas, Annunciation House, Marblehead Salt, and Marblehead Brewing.  Unlike the prior two applications that Bushell submitted for St. Nicholas, the April 2021 application reported that St. Nicholas had eight employees and total monthly payroll costs of $72,291.  Bushell also reported that Annunciation House had eight employees and total monthly payroll costs of $72,018; that Marblehead Salt had six employees and total monthly payroll costs of $54,018; and that Marblehead Brewing had six employees and total monthly payroll costs of $63,018.  For each application, Bushell submitted a letter from the accountant that explained that the applicant had been incurring, but not paying, payroll costs beginning in January 2020.  Bushell submitted lists of the names of the applicants' employees[17] and their average monthly payroll for January and

---

[17] Based on public records searches, these individuals include the general contractor and one or more subcontractors retained by the Targets to perform work at 120 Pleasant and/or 124 Pleasant, a freelance iconographer, a photographer, and other individuals who appear to be

February 2020 (for each, $8,333, or $100,000 annualized), as well as additional employment taxes, workers' compensation insurance payments, and health insurance costs for those months.[18] Records indicate that Marblehead Bank did not approve these applications because the bank's PPP funds had been exhausted as of May 5, 2021. Bank records indicate that, after the bank notified the Targets that PPP funds had been exhausted, Stockton called the bank and demanded to speak to the manager.

   f.  Shortly thereafter, in May 2021, Bushell submitted PPP applications to Greylock for Annunciation House, Marblehead Salt, Marblehead Brewing, and Emmaus House, which Bushell described as an association dedicated to spiritual formation and bible study. The Annunciation House and Marblehead Brewing applications each listed one employee (Bushell) and average monthly payroll of $8,333. The Marblehead Salt application listed two employees, identified in supporting documentation as Bushell and Father 1 and described as "two Orthodox Christian monks that have each taken a vow of poverty." The Emmaus House application reported that Emmaus House had four employees—four Orthodox Christian monks (Bushell, Father 1, and two others) that had each taken a vow of poverty—and a total average monthly payroll of $33,333. In a subsequent letter to Greylock, Stockton advised Greylock that she, Bushell, and the accountant had determined that only Annunciation House would qualify for a PPP loan from Greylock. Stockton asked Greylock to disregard the other applications and explained: "These entities have

---

acquaintances of the Targets. Besides Bushell and Stockton, who are listed on each applicant's list of employees, three other individuals are listed as employees of all four applicant entities (*i.e.*, five individuals paid at least $400,000 annualized each). One individual is listed as an employee of three of the entities; two individuals are listed as employees of two of the entities; and two individuals are listed as employees of one of the entities.

[18] As of November 2021, the Insurance Fraud Bureau of Massachusetts had no record of any workers' compensation coverage for St. Nicholas.

bookkeeping entries, but not the cancelled checks required to evidence the payroll disbursements required by your institution relative to the Program." Stockton provided Greylock with copies of eight checks from Annunciation House, all dated April 13, 2021, made payable to St. Paul's, and in the amount of $10,000. Stockton explained that, although the checks were dated April 13, 2021, the payments related to previously incurred pay for Bushell. On or about May 14, 2021, Greylock approved a PPP loan in the maximum amount of $20,833 for Annunciation House.[19] Stockton submitted a loan forgiveness application on or about February 17, 2022, and the SBA forgave this loan on or about February 24, 2022.

86.     With respect to all of these PPP applications, based on the investigation to date and my training and experience, I have determined that the Targets falsified payroll costs for Bushell and Stockton and, in some cases, fabricated additional employees to obtain or attempt to obtain PPP funds for which their affiliated organizations were not eligible.

### Misuse of Loan Proceeds

87.     After fraudulently obtaining EIDL and PPP funds, the Targets moved millions of dollars between various bank accounts and used those funds for the purchase of new property, for property renovations, and for other personal expenses.

88.     These transfers, payments, and purchases represented non-permitted uses of EIDL and PPP funds and unlawful transactions in fraudulently obtained loan proceeds.

---

[19] Bank records indicate that the Annunciation House account from which Bushell's purported $10,000 monthly salary was drawn previously had a balance of only approximately $115 until the deposit of $149,900 in EIDL funds into that account on April 13, 2021, before the paychecks were drawn. The Targets then deposited these checks into a bank account for St. Paul's. Therefore, the checks purportedly showing Bushell's salary appear to represent EIDL funds that the Targets simply moved from one account to another for the purpose of creating the appearance of a salary paid to Bushell by Annunciation House.

*Transfers Between Accounts*

89.     Under program rules, a borrower that receives EIDL funds must use those funds for the borrower's operations only and may not transfer those funds to another entity.

90.     Based on my review of bank records, I have determined that the Targets caused large transfers of EIDL funds between the borrowing entities.  For example:

a.      In June 2021, after Marblehead Salt received $499,900 in EIDL funds, the Targets transferred a total of $495,500 from Marblehead Salt into accounts for St. Paul's, St. Nicholas, and Marblehead Brewing (all by wire transfer) as well as Annunciation House (by a $42,500 check signed by Stockton).

b.      In July 2021, after Annunciation House received $350,000 in EIDL funds, the Targets transferred $340,000 from Annunciation House into accounts for St. Paul's (by a $50,000 check signed by Stockton) and St. Nicholas (by wire transfer).

c.      During the same month, St. Nicholas received $350,000 in EIDL funds, and the Targets wired $250,000 of those funds from St. Nicholas into an account for St. Paul's.

91.     From my review of bank records, I determined that the Targets transferred other EIDL deposits between entities in a similar fashion.  Based on my training and experience and the investigation to date, I believe that the Targets made these transfers for the purpose of obfuscating their affiliated entities' finances and the true sources of the funds received by these entities.

*Renovations of Pleasant Street Properties*

92.     On or about November 30, 2020, Bushell signed a commercial loan note for $1.5 million to refinance the mortgage on 124 Pleasant and acquire the adjacent 120 Pleasant property in the name of St. Nicholas and St. Paul's.  Stockton signed the note as a witness.

93.     Subsequently, Stockton and Bushell made monthly mortgage payments of approximately $7,600 from the St. Paul's and St. Nicholas accounts, for a total of approximately $136,301 between January 2021 and July 2022.  Based on my review of bank records, I have determined that the Targets used CARES Act funds to cover monthly mortgage payments on 120 Pleasant and 124 Pleasant.[20]

94.     Under program rules, neither EIDL nor PPP funds may be used to fund capital improvements.  However, Bushell and Stockton used EIDL and PPP proceeds to renovate and furnish the two commercial buildings at 120 Pleasant and 124 Pleasant.

95.     Public filings in the Marblehead litigation indicate that Bushell intended to develop 124 Pleasant into a brewery, beer garden, and fellowship hall.[21]  Based on the investigation to date and interviews of Town of Marblehead personnel, I am aware that, once he acquired 120 Pleasant, Bushell intended to develop it into the new location for St. Nicholas and to develop 124 Pleasant as the location of Marblehead Brewing and Marblehead Salt.

96.     Based on my review of bank records, I have determined that, between March 2021 and January 2022, Bushell and Stockton issued payments totaling at least $1.1 million to a general contractor and numerous vendors for renovations of 120 Pleasant and 124 Pleasant.

---

[20] On May 1, 2020—prior to their first receipt of CARES Act funds—the Targets controlled a total of only $29,732 across all of their organizations' existing bank accounts.  Between then and November 2020, the Targets' accounts received only approximately $58,000 in deposits other than CARES Act funds.

[21] In a declaration, Bushell stated: "Upon purchase of [124 Pleasant], St. Paul's dedicated [it] as a monastic complex including a shrine. … St. Nicholas intended to convert the Shrine's first floor into three separate areas: a workshop area in which beer would be brewed by monks, a chapel area for liturgical services and Holy Mysteries … and a church hall[.] … [124 Pleasant] also has an outdoor area that will be used to hold larger gatherings to celebrate feast days." *See* Marblehead litigation, Dkt. 45, ¶ 17.

97.     I have also determined that the Targets spent PPP and EIDL proceeds on fixtures and furnishings for the planned monastic complex.  For example:

a.      Between July 2021 and May 2022, Bushell purchased approximately $90,000 in audio video system equipment for St. Nicholas.

b.      In September 2021, the Targets purchased approximately $24,000 in sinks and marble tile for 124 Pleasant.

c.      Between January 2021 and January 2022, the Targets purchased approximately $8,100 worth of appliances for 124 Pleasant and deposited another $28,000 for $76,000 worth of additional appliances for 120 Pleasant and/or 124 Pleasant.[22]

d.      In February 2022, Bushell purchased five gas fireplaces for both 120 Pleasant and 124 Pleasant for approximately $49,000.

e.      Between June 2021 and May 2022, Bushell spent approximately $39,000 on antique furniture for 120 Pleasant, 124 Pleasant, and 22 Endicott.

*Purchase of Residential Property*

98.     Under EIDL program rules, a borrower must use EIDL funds for its operations only, and the purchase of a residential property is a non-permitted use of EIDL funds.

99.     Public records and real estate closing records indicate that, on or about June 30, 2022, Bushell purchased the single-family home at 12 Conant Street in Marblehead ("12 Conant"), adjacent to 22 Endicott, in the name of Egypt House, purportedly a religious non-profit corporation registered in the District of Columbia.

---

[22] The Targets also purchased approximately $25,000 worth of appliances for 22 Endicott. Based on the investigation to date and statements made by Bushell in the Marblehead litigation, I am aware that Bushell told others that he maintained a commercial kitchen at 22 Endicott and used the kitchen to produce salt.

100.     I have reviewed bank records and closing records for the purchase of 12 Conant. These records indicate that Egypt House purchased 12 Conant for $802,050.  From the bank and closing records, I have determined that, to fund this purchase, Stockton wired $787,269 from a bank account for St. Paul's to the closing and escrow company on or about June 29, 2022.[23]

101.     After purchasing 12 Conant outright, Bushell attempted to use it to obtain an additional loan.  Bushell submitted a business loan application to Greylock in Egypt House's name in or around May 2022, with St. Paul's as the guarantor.  On the application, Bushell stated: "12 Conant Road will be a rental property for Ukrainian or other refugees, refugees will pay rent." Correspondence with the bank indicates that, after Bushell grew frustrated with Greylock for not granting Egypt House an interest rate lock, Bushell wrote to a bank official, "I do not understand how you can justify literally taking food out of the mouths of starving refugees."  However, in other correspondence with the bank, Bushell indicated that Egypt House had leased 12 Conant for a year beginning in November for $4,500 per month.  He also indicated that he intended for 12 Conant to be a church rental property that would collect market or above-market rent.

102.     Compilation statements for St. Paul's that Bushell submitted to Greylock purported to show donations and charitable gifts of $1,515,214 in 2022 and $1,332,599 in 2021, as well as total payroll expenses of $801,667 in 2022 and $544,343 in 2021.  Based on my review of bank records, I have determined that St. Paul's received donations and charitable gifts of, at most, approximately $237,000 in 2021 and 2022 combined.  Further, I observed no bank account activity reflecting aid to refugees in recent years' statements.  The compilation statements for St. Paul's also listed an amount "due from related parties" of $2,724,552 for 2022.  Based on my review of

---

[23] Prior to receiving $1.5 million in EIDL funds in November 2021, this St. Paul's bank account held approximately $12,000.

records and the investigation to date, I believe that Bushell fabricated this asset category, as well as others, on the compilation statements submitted to Greylock.

*Cash Withdrawals and Personal Wire Transfers*

103.    Neither EIDL nor PPP funds may be used to engage in transactions that cannot be identified, such as withdrawing cash.

104.    Based on my review of bank records, I have determined that between August 2020 and August 2022, Bushell and Stockton together withdrew approximately $615,000 and 20,000 euros in cash from bank accounts that received EIDL and PPP proceeds.  Additionally, between July 2021 and February 2022, the Targets wired $53,000 from St. Paul's to Bushell's personal bank account and $43,000 from St. Paul's to Stockton's personal bank account.

105.    Prior to their receipt of EIDL and PPP funds, none of the bank accounts controlled by the Targets contained significant amounts of cash, and no other deposits during this period could have funded the Targets' withdrawals and personal transfers of these amounts of cash.

*Personal Expenses*

106.    Borrowers also may not use EIDL or PPP funds on personal expenses.

107.    Based on my review of bank and credit card records, I have determined that, between August 2020 and August 2022, the Bushell and Stockton used EIDL and PPP for personal expenses, including but not limited to the following:

a.    $50,000 to join the Centennial Society at the Economic Club of New York;

b.    $40,200 for a 2011 Breguet Reveil du Tsar Boutique Edition wrist watch;

c.    Approximately $42,000 for a membership to the Union League Club in New York;

d.    $26,713.39 for a Breguet Table Clock from circa 1791;

e.    $10,904 for 41 cases of wine from Gruet Winery;

      f.      $6,805 on a monogrammed luxury handbag from Maison Goyard for Stockton; and

      g.      $2,400 on items from Hermès.

      108.     Bushell applied for an American Express credit card in February 2022 under the name St. Paul's.  On the application, Bushell listed St. Paul's annual revenue as $10 million and his annual income as $900,000.  The most recent statements reflects charges of approximately $10,000 in Apple products and thousands of dollars on travel-related charges, including charges for hotels and dining.  Between March 2022 and July 2022, Bushell paid over $74,500 to American Express from a St Paul's bank account.  The American Express balance in August 2022 was over $42,000.

### *THE PREMISES CONTAIN EVIDENCE, FRUITS, AND INSTRUMENTALITIES*

      109.     There is also probable cause to believe that the Subject Premises contain fruits, evidence, and instrumentalities of violations of the federal statutes listed above, as described in Attachment B to each proposed search warrant.

      110.     Through surveillance and my review of records, I am aware that the Targets resided full-time at 22 Endicott throughout the duration of the conspiracy.[24]  Personnel from the United States Postal Service ("USPS") observed that the Targets received mail at the residence addressed to themselves and St. Paul's.  I am aware of no other location from which the Targets conducted the affairs of their affiliated organizations during this period.  As described above, the Targets used CARES Act proceeds to purchase numerous items for 22 Endicott, including appliances and antique furniture.  Additionally, the Targets withdrew large amounts of cash from the loan proceeds; based on my training and experience and the investigation to date, I believe that the

---

[24] Until her death in June 2022, Stockton's mother also resided at 22 Endicott.

Targets kept some or all of this cash at 22 Endicott.  Accordingly, there is probable cause that 22 Endicott contains fruits, evidence, and instrumentalities of the violations described herein.

111.    According to the organizations' websites and corporate registrations, St. Paul's, St. Nicholas, Marblehead Brewing, and Marblehead Salt are located at 124 Pleasant.  Stockton also maintained a website advertising a private law practice, which listed the law office's address as 124B Pleasant Street, an upstairs unit.  However, according to USPS personnel, no mail is currently delivered to 124 Pleasant, and surveillance suggests that 124 Pleasant remains under construction and unoccupied.[25]  As described above, the Targets used CARES Act proceeds to pay contractors for renovations to 124 Pleasant and to purchase equipment, furniture, and fixtures for 124 Pleasant, including audio video system equipment, appliances, tile, sinks, fireplaces, and furniture.  Accordingly, there is probable cause that 124 Pleasant contains fruits, evidence, and instrumentalities of the violations described herein.

112.    As described above, the Targets acquired 120 Pleasant during the conspiracy, used CARES Act funds to make mortgage payments on the property, intended for 120 Pleasant to become part of their planned monastic complex, and initiated renovations to the property.  Surveillance suggests that 120 Pleasant also remains under construction and unoccupied, and USPS personnel report that the property is not receiving any mail.  The Targets also purchased furniture, fixtures, and appliances for 120 Pleasant with CARES Act funds.  Accordingly, there is probable cause that 120 Pleasant also contains fruits, evidence, and instrumentalities of the violations described herein.

---

[25] In searching each of the Subject Premises, the government intends to employ search procedures designed to ensure that any potential attorney-client privileges are not violated.

## *SEIZURE OF COMPUTER EQUIPMENT AND DATA*

113.    From my training, experience, and information provided to me by other agents, I am aware that individuals operating organizations frequently use computers to carry out, communicate about, and store records about their organizations' operations.  These tasks are frequently accomplished through sending and receiving business-related email and instant messages; drafting other business documents such as spreadsheets and presentations; scheduling organization activities; keeping a calendar of activities; arranging for travel; storing pictures related to organization activities; purchasing and selling supplies online; researching online; and accessing banking, financial, investment, utility, and other accounts concerning the movement and payment of money online.

114.    From my training, experience, and information provided to me by other agents, I am aware that individuals frequently use computers to create and store records of their actions by communicating about them through e-mail, instant messages, and updates to online social-networking websites; drafting letters; keeping their calendars; arranging for travel; storing pictures; researching topics of interest; buying and selling items online; and accessing their bank, financial, investment, utility, and other accounts online.

115.    Based on my training, experience, and information provided by other law enforcement officers, I know that many cell phones (which are included in Attachment B's definition of "hardware") can now function essentially as small computers.  Phones have capabilities that include serving as a wireless telephone to make audio calls, digital camera, portable media player, GPS navigation device, sending and receiving text messages and emails, and storing a range and amount of electronic data.  Examining data stored on devices of this type

can uncover, among other things, evidence of communications and evidence that reveals or suggests who possessed or used the device.

116.    From my training and experience, I am aware that personal computer systems are generally capable of creating, receiving, and otherwise processing computer files generated for or to be used by an organization, such as e-mail, word-processing documents, photographs, and spreadsheets.

117.    From my training, experience, and information provided to me by other agents, I am aware that individuals and organizations commonly store records of the type described in Attachment B in computer hardware, computer software, smartphones, and storage media.

118.    Based on the investigation to date, I have determined that the Targets used computer equipment to submit fraudulent applications for CARES Act funds and to correspond with others about their spending of CARES Act funds.  For example, bank records and records from the SBA contain emails between the Targets and personnel at the banks and the SBA.  The Targets submitted all loan applications and supporting documentation through the SBA's online portal and through the banks' online systems for receiving loan application materials.  Bank records also indicate that the Targets accessed and transferred funds between the various bank accounts they controlled for their affiliated entities online.  Further, business records indicate that the Targets corresponded by email with the sellers of items that they purchased with CARES Act proceeds.

119.    Based on the investigation to date, including surveillance, I have not identified any potential locations for the computer equipment used by the Target other than the premises described herein.  While Bushell maintains a condominium in Washington, D.C., 22 Endicott was

his and Stockton's primary residence during the period in which they submitted loan applications and received loan proceeds.

120. Based on my knowledge, training, experience, and information provided to me by other agents, I know that computer files or remnants of such files can be recovered months or years after they have been written, downloaded, saved, deleted, or viewed locally or over the Internet. This is true because:

a. Electronic files that have been downloaded to a storage medium can be stored for years at little or no cost. Furthermore, when users replace their computers, they can easily transfer the data from their old computer to their new computer.

b. Even after files have been deleted, they can be recovered months or years later using forensic tools. This is so because when a person "deletes" a file on a computer, the data contained in the file does not actually disappear; rather, that data remains on the storage medium until it is overwritten by new data, which might not occur for long periods of time. In addition, a computer's operating system may also keep a record of deleted data in a "swap" or "recovery" file.

c. Wholly apart from user-generated files, computer storage media—in particular, computers' internal hard drives—contain electronic evidence of how the computer has been used, what it has been used for, and who has used it. This evidence can take the form of operating system configurations, artifacts from operating system or application operation, file system data structures, and virtual memory "swap" or paging files. It is technically possible to delete this information, but computer users typically do not erase or delete this evidence because special software is typically required for that task.

d. Similarly, files that have been viewed over the Internet are sometimes automatically downloaded into a temporary Internet directory or "cache." The browser often maintains a fixed

35

amount of hard drive space devoted to these files, and the files are overwritten only as they are replaced with more recently viewed Internet pages or if a user takes steps to delete them.

e.     Data on a storage medium can provide evidence of a file that was once on the storage medium but has since been deleted or edited, or of a deleted portion of a file (such as a paragraph that has been deleted from a word processing file).  Virtual memory paging systems can leave traces of information on the storage medium that show what tasks and processes were recently active.   Web browsers, email programs, and chat programs store configuration information on the storage medium that can reveal information such as online nicknames and passwords.   Operating systems can record additional information, such as the attachment of peripherals, the attachment of USB flash storage devices or other external storage media, and the times the computer was in use.  Computer file systems can record information about the dates files were created and the sequence in which they were created, although this information can later be falsified.

f.     As explained herein, information stored within a computer and other electronic storage media may provide crucial evidence of the "who, what, why, when, where, and how" of the criminal conduct under investigation, thus enabling the United States to establish and prove each element or alternatively, to exclude the innocent from further suspicion.  In my training and experience, information stored within a computer or storage media (e.g., registry information, communications, images and movies, transactional information, records of session times and durations, internet history, and anti-virus, spyware, and malware detection programs) can indicate who has used or controlled the computer or storage media.  This "user attribution" evidence is analogous to the search for "indicia of occupancy" while executing a search warrant at a residence. The existence or absence of anti-virus, spyware, and malware detection programs may indicate

whether the computer was remotely accessed, thus inculpating or exculpating the computer owner. Further, computer and storage media activity can indicate how and when the computer or storage media was accessed or used.  For example, as described herein, computers typically contain information that log computer user account session times and durations, computer activity associated with user accounts, electronic storage media that connected with the computer, and the IP addresses through which the computer accessed networks and the internet.  Such information allows investigators to understand the chronological context of computer or electronic storage media access, use, and events relating to the crime under investigation.  Additionally, some information stored within a computer or electronic storage media may provide crucial evidence relating to the physical location of other evidence and the suspect.  For example, images stored on a computer may both show a particular location and have geolocation information incorporated into its file data.  Such file data typically also contains information indicating when the file or image was created.  The existence of such image files, along with external device connection logs, may also indicate the presence of additional electronic storage media (e.g, a digital camera or cellular phone with an incorporated camera).  The geographic and timeline information described herein may either inculpate or exculpate the computer user.  Last, information stored within a computer may provide relevant insight into the computer user's state of mind as it relates to the offense under investigation.  For example, information within the computer may indicate the owner's motive and intent to commit a crime (e.g., internet searches indicating criminal planning), or consciousness of guilt (e.g., running a "wiping" program to destroy evidence on the computer or password protecting/encrypting such evidence in an effort to conceal it from law enforcement).

g.      A person with appropriate familiarity with how a computer works can, after examining this forensic evidence in its proper context, draw conclusions about how computers were used, the purpose of their use, who used them, and when.

h.      The process of identifying the exact files, blocks, registry entries, logs, or other forms of forensic evidence on a storage medium that are necessary to draw an accurate conclusion is a dynamic process. While it is possible to specify in advance the records to be sought, computer evidence is not always data that can be merely reviewed by a review team and passed along to investigators. Whether data stored on a computer is evidence may depend on other information stored on the computer and the application of knowledge about how a computer behaves. Therefore, contextual information necessary to understand other evidence also falls within the scope of the warrant.

i.      Further, in finding evidence of how a computer was used, the purpose of its use, who used it, and when, sometimes it is necessary to establish that a particular thing is not present on a storage medium. For example, the presence or absence of counter-forensic programs or anti-virus programs (and associated data) may be relevant to establishing the user's intent.

j.      In addition, based on my knowledge, training, and experience, I know that organizations and individuals who operate them often retain correspondence, financial, transactional, and other business records for years to identify past customers and vendors for potential future transactions; monitor payments, debts, and expenses; resolve business disputes stemming from past transactions; prepare tax returns and other tax documents; and engage in other business-related purposes.

121.    Based on my knowledge and training and the experience of other agents with whom I have spoken, I am aware that in order to completely and accurately retrieve data maintained in

computer hardware, computer software or storage media, to ensure the accuracy and completeness of such data, and to prevent the loss of the data either from accidental or programmed destruction, it is often necessary that computer hardware, computer software, and storage media ("computer equipment") be seized and subsequently processed by a computer specialist in a laboratory setting rather than in the location where it is seized.  This is true because of:

a.      The volume of evidence ─ storage media such as hard disks, flash drives, CDs, and DVDs can store the equivalent of thousands or, in some instances, millions of pages of information. Additionally, a user may seek to conceal evidence by storing it in random order or with deceptive file names.  Searching authorities may need to examine all the stored data to determine which particular files are evidence, fruits, or instrumentalities of criminal activity.  This process can take weeks or months, depending on the volume of data stored, and it would be impractical to attempt this analysis on-site.

b.      Technical requirements ─ analyzing computer hardware, computer software or storage media for criminal evidence is a highly technical process requiring expertise and a properly controlled environment.  The vast array of computer hardware and software available requires even computer experts to specialize in some systems and applications.  Thus, it is difficult to know, before the search, which expert possesses sufficient specialized skill to best analyze the system and its data.  Furthermore, data analysis protocols are exacting procedures, designed to protect the integrity of the evidence and to recover even "hidden," deleted, compressed, or encrypted files. Many commercial computer software programs also save data in unique formats that are not conducive to standard data searches.  Additionally, computer evidence is extremely vulnerable to tampering or destruction, both from external sources and destructive code imbedded in the system

as a "booby trap."  Consequently, law enforcement agents may either copy the data at the premises to be searched or seize the computer equipment for subsequent processing elsewhere.

      c.     The premises may contain computer equipment whose use in the crimes or storage of the things described in this warrant is impractical to determine at the scene.  Computer equipment and data can be disguised, mislabeled, or used without the owner's knowledge.  In addition, technical, time, safety, or other constraints can prevent definitive determination of their ownership at the premises during the execution of this warrant.  If the things described in Attachment B are of the type that might be found on any of the computer equipment, these applications seek permission to search and seize the computer equipment onsite or off-site in order to determine their true use or contents, regardless of how the contents or ownership appear or are described by people at the scene of the search.

      122.    The law enforcement agents will endeavor to search and seize only the computer equipment which, upon reasonable inspection and/or investigation conducted during the execution of the search, reasonably appear to contain the evidence in Attachment B because they are associated with (that is used by or belong to) the Targets.  If however, the law enforcement agents cannot make a determination as to use or ownership regarding any particular device, the law enforcement agents will seize and search that device pursuant to the probable cause established herein.

      123.    In this case, I recognize that one or more of the Targets' affiliated organizations may be a functioning organization that may perform some legitimate functions, and that seizing computer equipment may have the unintended and undesired effect of limiting the organization's ability to function.

a.      As stated above, there are a variety of reasons why law enforcement agents might need to seize the computer equipment for subsequent processing elsewhere.  If an organization requires access to data that is not contraband or evidence of a crime, the government will work with the organization after the search to copy this data onto storage media provided by the organization for its use.

b.      If the search team determines that there is no reason to seize certain computer equipment during the execution of this warrant, the team will create an onsite electronic "image" of those parts that are likely to store data specified in the warrant, if imaging is practical.  Generally speaking, imaging is the taking of a complete electronic picture of the data, including all hidden sectors and deleted files.  Imaging permits the agents to obtain an exact copy of the computer's stored data without actually seizing the computer equipment.  However, imaging at the premises can often be impractical, because imaging is resource-intensive; it can take hours or days, thus requiring law enforcement agents to remain at the premises for much longer than they would remain if they seized the items, and it can require personnel with specialized experience and specialized equipment, both of which might be unavailable.  If law enforcement personnel do create an image at the premises, they will then search for the records and data specified in the warrant from the image copy at a later date off-site.

124.    These warrants authorize a review of electronic storage media, electronically stored information, communications, other records and information seized, copied or disclosed pursuant to these warrants in order to locate evidence, fruits, and instrumentalities described in these warrants.  The review of this electronic data may be conducted by any government personnel assisting in the investigation, who may include, in addition to law enforcement officers and agents, attorneys for the government, attorney support staff, and technical experts.  Pursuant to this

41

warrant, the FBI may deliver a complete copy of the seized, copied, or disclosed electronic data to the custody and control of attorneys for the government and their support staff for their independent review.

### UNLOCKING A DEVICE USING BIOMETRIC FEATURES

125.    I know from my training and experience, as well as from information found in publicly available materials, that some models of cellphones made by Apple and other manufacturers, offer their users the ability to unlock a device via the use of a fingerprint or through facial recognition, in lieu of a numeric or alphanumeric passcode or password.

126.    On the Apple devices that have this feature, the fingerprint unlocking feature is called Touch ID.  If a user enables Touch ID on a given Apple device, he or she can register up to 5 fingerprints that can be used to unlock that device.  The user can then use any of the registered fingerprints to unlock the device by pressing the relevant finger(s) to the device's Touch ID sensor. In some circumstances, a fingerprint cannot be used to unlock a device that has Touch ID enabled, and a passcode must be used instead, such as: (1) when more than 48 hours has passed since the last time the device was unlocked and (2) when the device has not been unlocked via Touch ID in 8 hours <u>and</u> the passcode or password has not been entered in the last 6 days.  Thus, in the event law enforcement encounters a locked Apple device, the opportunity to unlock the device via Touch ID exists only for a short time.  Touch ID also will not work to unlock the device if (1) the device has been turned off or restarted; (2) the device has received a remote lock command; or (3) five unsuccessful attempts to unlock the device via Touch ID are made.

127.    The passcode(s) that would unlock the device(s) found during the search of the premises is or are not currently known to law enforcement.  Thus, it may be useful to press the finger(s) of the user(s) of the device(s) found during the search of the premises to the device's

fingerprint sensor or to hold the device up to the face of the owner in an attempt to unlock the device for the purpose of executing the search authorized by this warrant.  The government may not otherwise be able to access the data contained on those devices for the purpose of executing the search authorized by this warrant.

128.    For these reasons, I request that the Court authorize law enforcement to press the fingers (including thumbs) of Bushell and Stockton to the sensor of the devices or place the devices in front of their faces for the purpose of attempting to unlock the device in order to search the contents as authorized by this warrant.

### CONCLUSION

129.    Based on the information described above, I have probable cause to believe that that the Targets have violated 18 U.S.C. §§ 1349 and 1956(h).

130.    Based on the information described above, I also have probable cause to believe that evidence, fruits, and instrumentalities of these crimes, as described in Attachment B, are contained within the premises described in Attachment A to each proposed warrant.

Respectfully submitted,

CHAD OAKES
Federal Bureau of Investigation

Sworn to by telephone in accordance with
Federal Rule of Criminal Procedure 4.1

Dated: October 11, 2022          5:07 p.m.

HON. DAVID H.
United States Magistrate Judge

43